CASTERTON *v.* AMERICAN BLOWER CO.

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE AP-
PLIANCES—RES IPSA LOQUITUR.
   A master cannot be held liable for injuries to a servant, caused
   by the falling of an elevator, where the evidence entirely fails
   to show what caused the elevator to fall.

2. SAME—ACTION—EVIDENCE—DEFECTS IN APPLIANCES—ADMISSI-
BILITY.
   Where, in an action to recover for injuries to a servant, caused
   by the fall of an elevator in defendant's factory, there is
   no evidence to show the immediate cause of the fall, it is
   error to exclude evidence offered to show that the elevator had
   previously shown symptoms of inefficiency or dangerous
   irregularity in its operation.

Error to Wayne; Frazer, J.   Submitted November 15,
1905.   (Docket No. 137.)   Decided December 22, 1905.

Case by Arthur Casterton against the American Blower
Company for personal injuries.   There was judgment for
defendant on a verdict directed by the court, and plaintiff
brings error.   Reversed.

*Frederic T. Harward,* for appellant.

*Bowen, Douglas, Whiting & Murfin,* for appellee.

HOOKER, J.   The defendant owned a manufacturing
plant, and the plaintiff was in its employ.   It had an ele-
vator, which was used for the handling of freight.   It
was about 70 feet from the place where plaintiff worked.
The elevator consisted of an open platform, about 6 feet
square, having two side pieces connected by a cross-beam
across the top, to which beam the lifting cable was at-
tached.   This cable extended to the roof of the building,
where it ran over two pulleys, and then descended to a
winding drum "in the machinery" which governed the

raising and lowering of the elevator. The machinery consisted of two loose pulleys, and a tight pulley and the drum, all of which were fastened to the ceiling of the first floor of the heater room (in which room plaintiff worked), a little east of the elevator and directly over a water-closet provided for use by the men. The ceiling of this room was about 14 feet high. There was no regular operator for the elevator, and it was used by the men indiscriminately as occasion required. One Grates, who operated it on the occasion of the accident, testified:

"It was operated by two belts. By pulling a rope, one belt was shifted from one of the idlers to the tight pulley, and the elevator ascended. By pulling the other rope, another belt was shifted from the other idler to the tight pulley, and the elevator descended. It was supposed to stop of itself when it arrived at the first floor."

On the occasion of the accident a workman took a truck containing 2,240 pounds of iron posts upon the elevator from the first to the second floor. Grates testified that when the elevator reached the second floor it stopped, but he heard the machinery still running, and knew that the elevator would fall, because, if it worked properly, the machinery would not have kept running. The belt would have gone upon the idler. He jumped off, and called to his companion to do so; but he did not have time. The elevator went down slowly about two feet, and then fell, or plunged, to the floor. He stated, further, that the effect of the elevator dropping was to speed up the pulley wheels that were over the closet, so that they burst. One of the pieces fell upon the plaintiff, who was at the time in the closet, and injured him. Another piece went up through the ceiling and floor above.

What caused the elevator to act as above described was not shown. No one seemed to know that it was out of repair in any particular. Grates also testified that the reason that the elevator fell was because the machinery was not in the right condition, but the testimony shows that his only reason for the conclusion was the fact that

the machinery fell.   He also said that he saw no safety clutches upon the side of the elevator.   One Watson was called for plaintiff.   He had worked there on an elevator (presumably this one) in 1902.   Being asked if that elevator ever fell with him, the court sustained an objection, saying, however, that counsel might show that the elevator was faulty.   One Singer testified that he worked there in the fall of 1903.   He was asked:

"Did you ever know that elevator to fall while you were there?   *   *   *

"Did you ever repair the elevator machinery, or help repair it, in 1903?   *   *   *

"How many times had you, previous to October 12, 1903, repaired that elevator?   *   *   *

"What defects, when you repaired that elevator along that time, did you find?"

All of these questions were objected to, and the objections were sustained, except the last; the court saying:

"You may tell what defects you found in the elevator when you repaired it."

His answer was:

"The cable was loose.   *   *   *   It happened once in a while."

He testified that he did not know of his own knowledge what caused it to fall on this occasion.   This witness said that he did not repair it after the accident, though he saw it, and the center pulley—i. e., the tight pulley—was broken.   Fred Houston, a millwright, was sworn for the plaintiff.   He testified that he had the care of this machinery.   Counsel asked:

"Was that a cranky elevator?   *   *   *

"Didn't it work spasmodically at times?   *   *   *

"Had it not, within a year previous to this accident, become ungovernable and fallen in a similar manner?   *   *   *

"How many times, to your knowledge, if you have any, has this elevator become ungovernable?"

Answers to these questions were not permitted.   The

witness stated that the three pulleys were broken on the
occasion of the accident. This witness disputed Grates,
by saying that the machinery was not expected to stop;
that it is supposed to go at all times; that it would simply
run the idlers and not the elevator. The court asked:

"From the facts you saw there, could you tell how
that thing broke, from the examination you made of it?
  "*A*. No, sir.    *    *    *
  "*Q*. What is your opinion?
  "*A*. When the elevator started up, the operator, or who-
ever it was, when he started the elevator up, I don't be-
lieve he properly shifted the belt onto the tight pulley;
but it was far enough to start the machinery going—to
lift the elevator. When the elevator arrived at the top
landing, it only had probably two inches of belt, where it
should have had four, to throw off. Well, they had a
good-sized load, not over the capacity of the elevator. I
don't believe, and being the case that there is only a small
amount of belt there to throw off this tight pulley, and
then the brake is supposed to set at the same time between
the two. The brake didn't have time to set, and the
weight that was on the car caused it to lower. It didn't
drop.
  "*Q*. Where does the brake set?
  "*A*. Onto the tight pulley.
  "*Q*. Does it set on the pulley? Is the brake right on
the pulley?
  "*A*. Yes, it faces the pulley; yes, sir. The brake
shoe on the car.
  "*Q*. And the falling of the elevator made the wheel go
so fast that the brake set and broke it?
  "*A*. That is my supposition—that when the car arrived
at the bottom floor that the pulleys were going about 600
revolutions a minute, and this brake was set on it.
  "*Q*. Were there any safety catches on the side of
that elevator?
  "*A*. Yes, sir."

In answer to further questions by plaintiff's counsel, he
said that he had lifted twice that weight on the same-sized
machine. He also said that a new lifting cable had been
put on two days before the accident. The court said to
the jury that the only evidence presented was the fact that

the pulleys broke; the cause or reason being entirely unknown. He held that negligence had not been shown, and plaintiff could not recover. The important question is, therefore, whether he was right in saying that there was no evidence introduced from which it was proper to infer that the accident was due to defendant's negligence. His exclusion of the testimony offered is also relied on by appellant. The testimony fails to show why the elevator failed to work properly on this occasion. That the belt was not removed from the fixed pulley to the idler is perhaps a probable solution; but whether this was due to improper management by a fellow-servant or some defect in the machinery cannot be determined from any proof offered, or, if it be said that it must have been the latter, we can only conjecture the nature, cause, or period of existence of such defect. The court did not err in refusing to permit the jury to find negligence in the location of the closet. The defendant was not bound to forego the use of the space occupied by it for some purpose in connection with his business, and there is no testimony justifying an inference that it is common to locate elevators in a remote place, and to keep employés from working in the vicinity of them. Hence, under the testimony admitted, there was no error in directing a verdict for the defendant.

While we cannot hold one guilty of negligence upon a mere conjecture, it does not follow that we must hold one not guilty in all cases where the immediate cause or defect is uncertain. We have many cases which hold that where a machine has worked well up to the time of the accident, and the occasion is unexpected and unexplained, a charge of negligence is not sustained. These cases are not necessarily applicable to a case where the machine has previously shown symptoms of inefficiency or dangerous irregularity in its operation; for with such warnings it may be the duty of the proprietor to ascertain and remedy the tendency. It would be unreasonable to limit a right to recover to those cases where the plaintiff should be able to diagnose the particular cause of its inefficiency

and prescribe the remedy. In the case of *Redmond* v. *Lumber Co.*, 96 Mich. 545, this duty of the master in such cases was recognized. It was said:

"In the present case there is no evidence tending to show that the machinery was out of repair, unless it is to be assumed from the alleged fact that it did not stop when the lever was released. On the contrary, all of the evidence showed that immediately before and after the accident it was in working order. If there were anything to show that the machinery had been out of order, and that its working was spasmodic or uncertain, there might be room for the contention that the defendant was negligent in not keeping it in repair; but the mill was put in good order in the spring, and the jack had worked perfectly up to the time of the accident, clearly indicating that defendant could have no notice that repairs were necessary."

We think, therefore, that the court erred in excluding evidence of previous failures of the elevator to work properly, though, perhaps, some of the questions were objectionable in form.

The judgment is reversed, and a new trial ordered.

GRANT, BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.